**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK SERRI, on Behalf of Himself and All Others Similarly Situated, | Case No. 18-11458 |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT<br>**JURY TRIAL DEMANDED** |
| JPMORGAN CHASE & CO., JOHN EDMONDS, and JOHN DOE Nos. 1-10, | |
| Defendants. | |

Plaintiff Mark Serri ("Plaintiff"), individually and on behalf of all others similarly situated, as defined below, alleges the following based upon his personal knowledge and upon information and belief as to all other matters against Defendants JPMorgan Chase & Co., John Edmonds, and John Doe Nos. 1-10 (collectively, "Defendants"), as follows:

## I.   NATURE OF THE ACTION

1.     This action arises from Defendants' unlawful and intentional manipulation of the prices of gold, silver, platinum, and palladium (collectively, "precious metals") futures contracts and options on such contracts traded on the New York Mercantile Exchange ("NYMEX") and the Commodity Exchange, Inc. ("COMEX") from approximately January 1, 2009 through December 31, 2015 (the "Class Period") in violation of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* ("CEA") and the common law.

2.     Defendants are a group of precious metals traders and the bank that employed them during the Class Period.

3.     On November 6, 2018, the United States Department of Justice ("DOJ") announced that Defendant John Edmonds ("Edmonds") pleaded guilty in federal court in the District of

1

Connecticut on October 9, 2018 to one count of conspiracy to commit write fraud, commodities fraud, commodities price manipulation, and spoofing and one count of commodities fraud for his scheme to manipulate the market for precious metals futures contracts.[1] As a result of his unlawful conduct, Defendant Edmonds faces a maximum combined term of imprisonment for his criminal conduct of 30 years and a fine that is the greater of (1) twice his gross gain resulting from the offenses; (2) twice the gross loss resulting from the offenses; or (3) $250,000.[2]

4.      The DOJ press release indicated that Defendant Edmonds executed his manipulation scheme with other trading partners employed at Defendant JP Morgan Chase & Co. ("JPM"), including more senior traders, and with the knowledge and consent of his immediate supervisors.[3]

5.      Specifically, Defendants manipulated the prices of NYMEX platinum and palladium and COMEX silver and gold futures and options contracts during the Class Period using a technique called "spoofing" (explained *infra*) whereby Defendants routinely placed electronic orders to buy and sell such futures contracts with the intent to cancel those orders before execution. These spoof orders injected materially false and illegitimate signals of supply and demand into the market and were intended to induce other market participants to trade at futures prices that were made artificial as a result of Defendants' unlawful conduct.

6.      Defendants' spoof orders were intended to, and did in fact, artificially move the prices of NYMEX and COMEX precious metals futures and options contracts during the Class Period in a pre-determined direction that was favorable to Defendants, but unfavorable to Plaintiff

---

[1] *Former Precious Metals Trader Pleads Guilty to Commodities Fraud and Spoofing Conspiracy*, DEPARTMENT OF JUSTICE: OFFICE OF PUBLIC AFFAIRS, (Nov. 6, 2018), https://www.justice.gov/opa/pr/former-precious-metals-trader-pleads-guilty-commodities-fraud-and-spoofing-conspiracy (last accessed Nov. 12, 2018); *U.S. v. Edmonds*, Case No.: 3:18-cr-239 (RNC), ECF Nos. 7-8 (D. Conn. Oct. 9, 2018).
[2] *Id.*
[3] *Id.*

and the proposed Class.

7.    Given the concealed nature of Defendants' unlawful conduct, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S. C. §§ 1331 and 1337(a), and Section 22 of the CEA, 7 U.S.C. § 25.

9.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), (c), and (d) and Section 22 of the CEA, 7 U.S.C. § 25(c), because Defendants are believed to have transacted business throughout the United States, including in this District, and are believed to have resided, are found, or have agents within this District, and a significant portion of the affected interstate trade and commerce discussed below was carried out in this District.

10.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant is believed to have: (a) transacted business throughout the United States, including in this District; (b) committed overt acts in furtherance of their illegal scheme and conspiracy throughout the United Sates, including the manipulation of the prices of precious metals futures contracts and options traded in this District on the NYMEX and COMEX; (c) had and maintained substantial contacts within the United Sates, including in this District; and/or (d) directed conduct that had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

11.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to the mails, interstate telephone communications, and the facilities of the commodities markets.

The activities of Defendants were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

## III.    THE PARTIES

### A.    Plaintiff

12.    Plaintiff Mark Serri is a resident of Medford, New York. Plaintiff transacted in COMEX gold futures and options contracts during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation as alleged herein. Defendants deployed the spoofing scheme alleged herein hundreds of times throughout the Class Period, depriving Plaintiff and the Class of the ability to transact in a lawful, un-manipulated market. Plaintiff suffered economic injury, including monetary losses, as a direct result of Defendants' manipulation of NYMEX and COMEX precious metals futures and options contracts during the Class Period.

### B.    Defendants

13.    Defendant JPMorgan Chase & Co. ("JPM") is an investment bank and financial services company headquartered in this District at 270 Park Avenue, New York, New York, 10017. Defendant JPM provides businesses, institutions, and individuals with investment banking, treasury and securities, asset management, private banking, and commercial banking services. Its U.S.-based traders transacted in precious metals futures and options contracts on NYMEX and COMEX throughout the Class Period.

14.    Defendant John Edmonds ("Edmonds") was employed by Defendant JPM for 13 years, including the entire duration of the Class Period, as a trader of precious metals futures or options. Defendant Edmonds is a resident of Brooklyn, New York. On October 9, 2018, Edmonds pleaded guilty in the District of Connecticut to one count of conspiracy to defraud the market and manipulate the prices of NYMEX and COMEX precious metals futures contracts and one count

of commodities fraud related to the allegations herein.

15.    Defendants John Does 1-10, inclusive, are other traders of precious metals futures and options employed by Defendant JPM that participated in, facilitated, and assisted with the manipulation and unlawful conduct alleged herein. These Defendants are both known and unknown to the United States Attorney.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Definitions

16.    **The CME Group** is comprised of four Designated Contract Markets ("DCMs"), including the NYMEX and COMEX. The CME Group is also the holding company and the parent of the NYMEX and COMEX. The CME Group's Global Headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606.

17.    **CME Globex** is owned and operated by the CME Group. CME Globex is the premier electronic trading platform used to trade futures and options contracts. CME Globex is an open access marketplace that allows a market participant to directly enter his or her own trades and participate in the trading process, including viewing the book of orders and real-time price data nearly 24 hours a day.

18.    CME Globex permits the trading of futures and options contracts or securities, between buyers and sellers, including trading other than on a principal-to-principal basis. CME Globex is subject to NYMEX and COMEX rules, including rules that (a) govern the conduct of CME Globex users, and (b) provide for disciplinary sanctions other than the exclusion from trading.[4] CME Globex falls within the Commodity Futures Trading Commission's definition of an

---

[4]    *NYMEX Rulebook: Rule 402*, CME GROUP, *available at* https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/4.pdf (last accessed Nov. 12, 2018); *COMEX Rulebook: Rule 402*, CME GROUP, *available at* https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/4.pdf (last accessed Nov. 12, 2018);

"exchange;" *i.e.*, "[a] central marketplace with established rules and regulations where buyers and sellers meet to trade futures and options contracts or securities."[5]

19.      A variety of CME Group products are available to trade on the CME Globex platform including, but not limited to, the precious metals futures and options contracts.[6] To access CME Globex, customers must have a CME Group clearing firm relationship, CME Group-certified trading application and connectivity to CME Globex.[7] Thus, anyone who has an account with a Futures Commission Merchant or Introducing Broker, who in turn has a CME Clearing guarantee, can trade on CME Globex.[8]

20.      **Commodity Futures Contract.** A commodity "futures" contract is a promise to buy or sell a predetermined amount of a commodity at a specific price and at a specific time in the future.  In the context of futures trading, the commodity is the underlying instrument upon which a futures contract is based; *i.e.* the trading occurs in the contract, not in the commodity. The NYMEX and COMEX, as DCMs pursuant to Section 5 of the CEA, 7 U.S.C. § 7, specify the terms of trading, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations, and margin requirements. Commodity futures contracts include e-mini contracts, as defined herein.

21.      **"Long" and "Short" Futures.** Trades of precious metals on NYMEX and COMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to

---

*NYMEX Rulebook, Chapter 5, Globex Electronic Trading System Rules*, CME GROUP, *available at* https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/5.pdf (last accessed Nov. 12, 2018); *COMEX Rulebook, Chapter 5, Globex Electronic Trading System Rules*, CME GROUP, *available at* https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/5.pdf (last accessed Nov. 12, 2018).
[5]      *Glossary*, U.S. COMMODITY FUTURES TRADING COMMISSION, *available at* https://www.cftc.gov/ConsumerProtection/EducationCenter/CFTCGlossary/glossary_e.html (last accessed Nov. 12, 2018).
[6]      *CME Globex Reference Guide*, CME GROUP, *available at* https://www.cmegroup.com/globex/files/GlobexRefGd.pdf (last accessed Nov. 12, 2018), at p.5.
[7] *Id.*
[8] *Id.* at p. 2.

pay for the precious metal and take delivery. The "short" side represents the seller of a contract who is obligated to receive payment for the precious metal and make delivery. If a market participant holds its position to the end of the settlement period for a precious metals futures contract, the market participant is obligated to "go to delivery." In other words, upon the settlement date, the "futures" contract for a particular month becomes a present contractual obligation for the purchase and sale of the physical precious metal. The price for the precious metal that goes to delivery is the "settlement price" of the futures contract.

22.    **E-minis** are futures contacts that represent a fraction of the value of standard futures and are electronically traded on the Chicago Mercantile Exchange (defined below). As futures contracts, e-minis represent agreements to buy or sell the cash value of an underlying contract at a specified date in the future. Each contract is sized at a certain value multiplied by the underlying contract's price.

23.    **Offset by Trading.** Only a small percentage of all futures contracts traded each year on NYMEX and COMEX result in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of one futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery by selling one equivalent futures contract. The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

24.    Wholly unlike the securities markets, in the commodity futures market, (1) more than 99% of the contracts do not result in delivery and may remain open for multi-month periods with no delivery of the commodity, and (b) at any given time, one-half of the participants in the futures market are sellers of a contract or "short" and one-half of the participants are the buyers of

a contract or "long."

25.    **Commodity Options Contract**. A commodity "options" contract is a promise that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell the underlying commodity at a specified price during a specified time period. The buyer of an option pays an "option premium" to the seller for the right to buy or sell the underlying commodity (in this case, NYMEX and COMEX precious metals futures contracts). Generally, there are two types of options: calls and puts.

26.    **"Call options"** give the holder of the option the right, but not the obligation, to buy the underlying commodity at the specified price (the "strike" price). Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price. The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit.  The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value. Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

27.    **"Put options"** confer upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price, and they confer upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised. The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price. Conversely, the seller of the put option wants the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

28.     **NYMEX Platinum Futures Contract** is a futures contract where the underlying commodity is 50 troy ounces of platinum. NYMEX platinum futures contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX including Chapter 105 of the NYMEX Rulebook, and traded electronically on the CME's Globex platform.

29.     **NYMEX Palladium Futures Contract** is a futures contract where the underlying commodity is 100 troy ounces of palladium. NYMEX palladium futures contracts are listed on the NYMEX, subject to the rules and regulations of NYMEX including Chapter 106 of the NYMEX Rulebook, and traded electronically on the CME's Globex platform.

30.     **COMEX Silver Futures Contract** is a futures contract where the underlying commodity is 5,000 troy ounces of silver. COMEX silver futures contracts are listed on the COMEX, subject to the rules and regulations of COMEX including Chapter 112 of the COMEX Rulebook, and traded electronically on the CME's Globex platform.

31.     **COMEX Gold Futures Contract** is a futures contract where the underlying commodity is 100 troy ounces of gold. COMEX gold futures contracts are listed on the COMEX, subject to the rules and regulations of COMEX including Chapter 113 of the COMEX Rulebook, and traded electronically on the CME's Globex platform.

**B.     Market Background**

32.     Precious metals futures contracts and options are traded on COMEX and NYMEX. These contracts, during various parts of the Class Period, were traded in both an "open-outcry" setting and on an electronic trading platform. In recent years, complex, automated, and high-speed trading strategies have taken hold in virtually every financial market, including commodities futures markets, making the markets much more susceptible to manipulation. Driving this change has been a massive shift to Automated Trading Systems (ATSs) otherwise known as algorithmic

trading.

33.    A study completed by the Commodity Futures Trading Commission ("CFTC") determined that between October 2012 and 2014, over 95% of all futures traded on any exchange occurred on DCMs' electronic trading matching platforms, such as NYMEX and COMEX.[9]

34.    Additionally, as seen from the figure below, commodity markets, including that of metals, have become more accessible to a larger number of investors.[10]



35.    In addition, the CFTC found that the two largest U.S. DCMs have indicated that their average order entry roundtrip times are less than one millisecond.[11]

36.    High speed trading is more susceptible manipulative trading activities.[12] Regulators at large have adapted to focus on the computer-driven nature of trading, with nearly every significant regulator voicing concerns about the need for heightened monitoring of these practices.[13]

[9]    *Regulation Automated Trading*, COMMODITY FUTURES TRADING COMMISSION, *available at* http://www.complinet.com/net_file_store/new_editorial/c/f/CFTC-REG-AT.pdf  (last accessed Nov. 12, 2018).
[10]    Commodity investors embrace algorithmic trading, FINANCIAL TIMES, (July 6, 2017), *available at* https://www.ft.com/content/c386de76-61a2-11e7-8814-0ac7eb84e5f1  (last accessed Nov. 12, 2018).
[11]    *The World's Leading Electronic Platform: CME Globex*, CME GROUP, (2014), *available at* http://www.cmegroup.com/globex/files/globexbrochure.pdf (last accessed Nov. 12, 2018) at p. 3.
[12]    'Spoofing' case highlights perils of automated trading, FINANCIAL TIMES, (Nov. 13, 2016), *available at* https://www.ft.com/content/a60b4c4c-a988-11e6-809d-c9f98a0cf216 (last accessed Nov. 12, 2018).
[13]    *Impact Analysis: Nasdaq publishes white paper, suggestions for detecting spoofing*, REUTERS, (July 5, 2017)

37.    The speed and precision that comes with algorithmic trading can easily be used to unlawfully manipulate the market. One of the most widely used disruptive and unlawful trading practices is "spoofing."

38.    Spoofing is a disruptive trading practice whereby a trader submits bids or offers with the intent to cancel the bid or offer before execution, submits or cancels bids and offers to overload the quotation system of a marketplace, or submits multiple bids or offers to create the appearance of false market depth.[14]

39.    The CME acknowledges that the CFTC, under Rule 575, prohibits "spoofing," which includes "submitting or cancelling multiple bids or offers to create a misleading appearance of market depth and submitting or cancelling bids or offers with intent to create artificial price movements upwards or downwards."[15]

**C.    Defendants Manipulated and Made Artificial the Prices of NYMEX and COMEX Precious Metals Futures Contracts and Options Throughout the Class Period**

40.    The purpose of Defendants' manipulative scheme was to inject materially false and illegitimate signals of supply and demand into the market in order to (a) induce Plaintiff and the proposed Class to trade against Defendants' genuine orders on the opposite side of the market from the spoof orders at prices, quantities, and times at which they would otherwise not have traded, and (b) financially benefit Defendants.

41.    Accordingly, for Defendants to avoid losses and to make money, Defendants routinely placed electronic orders to buy and sell NYMEX and COMEX precious metals futures

---

*available at* https://www.reuters.com/article/bc-finreg-nasdaq-spoofing-idUSKBN19Q244 (last accessed Nov. 12, 2018).
[14] *"Spoofing" and Disruptive Futures Trading Practices*, NEW YORK INSTITUTE OR FINANCE, *available at* https://www.nyif.com/articles/disruptive-futures-trading-practices-spoofing (last accessed Nov. 12, 2018).
[15] *Market Regulation Advisory Notice*, CME GROUP, (Oct. 9, 2015).

contracts with the intent to cancel those orders before execution. Defendant Edmonds, learned this deceptive trading strategy from more senior traders employed by Defendant JPM. Defendant Edmonds personally deployed this manipulative strategy hundreds of times during the Class Period with the knowledge and consent of his immediate supervisors.

42.     Defendants placed the spoof orders on NYMEX and COMEX electronically from computers at Defendant JPM's New York office. The illegitimate and intentionally misleading signals conveyed by the spoof orders were then disseminated to the market.

43.     In placing the spoof orders, Defendants intended to and did deceive other market participants by injecting materially false and illegitimate signals of supply and demand into the market for NYMEX and COMEX precious metals futures and options contracts. The spoof orders thus were intended to induce Plaintiff and the Class to trade against Defendants' genuine orders that they wanted to execute on the opposite side of the market from the spoof orders at prices, quantities, and times at which Plaintiff and the Class would not otherwise have traded.

44.     These spoof orders were intended to, and did in fact, artificially move the prices of NYMEX and COMEX precious metals futures and options contracts during the Class Period in a pre-determined direction that was favorable to Defendants, but unfavorable to Plaintiff and the Class.

45.     Defendant Edmonds has admitted that, from 2009 through 2015, he "knowingly and willfully conspired with others at [Defendant] JP Morgan to commit wire fraud, commodities fraud, commodities price manipulation and spoofing, and…knowingly and with the intent to defraud executed, and attempted to execute, a scheme to defraud others in connection with precious metals futures contracts."[16]

---

[16] *U.S. v. Edmonds*, Case No.: 3:18-cr-239 (RNC), ECF No. 3 (D. Conn. Oct. 9, 2018).

46.    Defendant Edmonds further admitted that while he was a trader at JPM, he was "instructed by supervisors and more senior traders to trade in a certain fashion, namely, to place orders that [he] intended to cancel before execution, which is also referred to as 'spoofing.' More specifically, [he] was instructed that if a client wished to sell futures, [he] should simultaneously place both bids and offers with the intent of canceling the bids prior to execution. In other words, by placing bids that [he] never intended to execute, [he] would falsely transmit liquidity and price information, which would deceive other market participants regarding supply and demand. These actions would induce those other market participants to trade against the orders that [he and Defendant JPM] wanted to execute. Stated differently, by placing multiple bids which [he and Defendant JPM] never intended to execute, [he and Defendant JPM] created marketed activity which artificially drove the sell price up and induced other market participants to purchase at an inflated price."[17]

47.    Edmonds followed this same illegal procedure if a client wanted to purchase precious metals futures.[18]

48.    One specific example, (among hundreds of others), of Defendant Edmonds' and Defendant JPM's unlawful manipulative behavior occurred on or about October 12, 2012, at approximately 1:08:48.831 p.m. (Central Daylight Time), when Defendant Edmonds, with the knowledge and consent of his supervisors at JPM, placed a spoof order to sell 402 COMEX silver futures contracts at the price of $33.610. Defendants placed this order with the intent, at the time the offer was entered, to cancel the offer before it could be executed which sent materially false and illegitimate signals of supply and demand to the market so that Defendants could purchase approximately six COMEX silver futures contracts at an artificially low price.

---

[17] *Id.*
[18] *Id.*

49.     Defendants' illegal orders were placed electronically from JPM's computers in New York, New York, and were trasmitted interstate to servers in Chicago, Illinois.

50.     This manipulative strategy injured Plaintiff and the Class by causing them to transact in NYMEX and COMEX precious metals futures and options contracts at artificial prices and thereby suffer monetary losses. For example, the DOJ found that Defendants' October 12, 2012 spoof order caused COMEX silver futures prices to decrease, which caused members of the Class to transact an artificially low price for COMEX silver futures.

51.     Through their manipulative conduct, Defendants unlawfully increased their profits at the expense of Plaintiff and the members of the Class. As a result of Defendants' sophisticated and ulawful manipulative strategy, innocent market participants such as Plaintiff and the Class traded NYMEX and COMEX precious metals futures and options contracts at artificial prices throughout the Class Period.

## V.     CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself, and all others similarly situated. The Class is defined as:

> All persons or entities, other than Defendants and their employees, affiliates, parents, subsidiaries, co-conspirators (whether or not named in this Complaint), federal government entities and instrumentalities of the federal government, who purchased or sold any NYMEX or COMEX precious metals futures contract or any option on those futures contracts, during the period of at least January 1, 2009 through at least December 31, 2015.

53.     Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to establish Sub-Classes where appropriate.

54.     The Class is so numerous that joinder of all potential members is impracticable.

While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that there are at least hundreds, if not thousands, of proposed members of the Class throughout the United States who transacted in NYMEX and COMEX precious metals futures contracts or any option on those futures contracts at artificial prices throughout the Class Period.

55.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising directly out of Defendants' common course of conduct in the violations of law as complained of herein.

56.    Plaintiff will fairly and adequately protect the interests of the members of the Class, has no interest that is adverse to the interests of absent Class members, and has retained counsel competent and experienced in class action litigation, including commodity futures manipulation.

57.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful conduct, which was generally applicable to all the members of the Class, hereby making appropriate relief with respect to the Class as whole. Such questions of law and fact common to the Class include, but are not limited to:

a)    Whether Defendants manipulated the price of any NYMEX and COMEX precious metals futures contract(s) or any option(s) on those futures contract(s), in violation of the CEA;

b)    Whether Defendants' manipulating of the price of any NYMEX and COMEX precious metals futures contract(s) or any option(s) on those futures contract(s) caused those prices to be artificial;

c)    Whether such manipulation resulted in artificial prices for precious metals futures contracts;

d)    Whether such manipulation caused a cognizable injury under the CEA;

e)    Whether Defendants' unlawful conduct caused actual damages to Plaintiff and the Class;

f)    Whether Defendants were unjustly enriched at the expense of Plaintiff and members of the Class;

g)      Whether such injury or the extent of such price artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric analysis, or other economic tests;

h)      The identities of the participants in the manipulation;

i)      The duration of Defendants' unlawful conduct;

j)      The nature and extent of Defendants' violations; and

k)      The appropriate relief.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

59.     Class action treatment is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members. The records of commodity futures traders are required to be maintained by Futures Commission Merchants.[19] Plaintiff does not anticipate any difficulties in identifying Class members, providing notice to Class members, or in any other aspects of the management of this action as a class action.

60.     The Class may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially  impair the ability of such nonparties to protect their interests.

---

[19] *Futures Commission Merchants (FCMs)*, U.S. COMMODITY FUTURES TRADING COMMISSION, *available at* https://www.cftc.gov/IndustryOversight/Intermediaries/FCMs/fcmibdisclosures.html (last accessed Nov. 16, 2018).

61.     The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

62.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## VI.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

63.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful manipulation of the prices for NYMEX and COMEX precious metals futures contracts and options on such contracts. Moreover, by its very nature, the unlawful activity alleged herein that Defendants engaged in was self-concealing.

64.     Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for precious metals futures contracts and options, by intentionally submitting and canceling trade orders in concert with each other.

65.     Defendants concealed their manipulative acts by, *inter alia*, placing electronic orders to buy or sell NYMEX and COMEX precious metals futures contracts at certain prices, even though they secretly had no intent of actually transacting at those prices. At no point did Defendants disclose that their orders were placed deceptively to manipulate the prices of NYMEX and COMEX precious metals futures contracts. Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' manipulation any earlier than the date of the public disclosures thereof.

66.     Although Defendant Edmonds pleaded guilty to conduct related to the illegal

activities alleged herein in the District of Connecticut on October 9, 2018, this proceeding was sealed.

67.    As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence before November 5, 2018, when the U.S. District Court Judge Robert N. Chatigny granted the DOJ's motion to unseal the case, including the information filed against Defendant Edmonds.

68.    Due to Defendants' fraudulent concealment and the self-concealing nature of Defendants' manipulative acts, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## VII.  VIOLATIONS ALLEGED

### FIRST COUNT
**Manipulation in Violation of the Commodity Exchange Act
(7 U.S.C. §§ 1, *et seq.*)**

69.    Plaintiff incorporates by reference the preceding allegations.

70.    Each Defendant, individually, and in concert, and/or as one another's control persons or agents, through their acts alleged herein, from at least January 1, 2009 through at least December 31, 2015, specifically intended to and did cause unlawful and artificial prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

71.    Defendants manipulated the price of a commodity in interstate commerce or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

72.    During the Class Period, the prices of NYMEX and COMEX precious metals

futures contracts and options on those futures contracts, did not result from the legitimate market information and the forces of supply and demand. Instead, the prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, were artificially inflated, or deflated, by Defendants' spoofing and other unlawful manipulative trading activities.

73.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled, specifically intending to cancel those orders prior to execution. Defendants did this with the intent to inject illegitimate information about supply and demand into the market place, and to artificially move prices up or down in a pre-determined direction to suit Defendants' own related trades and positions. As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in NYMEX and COMEX precious metals futures contracts and options on those futures contracts.

74.     Through their use of spoofing and other manipulative techniques, Defendants manipulated the prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, throughout the Class Period and thereby caused damages to Plaintiffs and Class members who purchased or sold such instruments at the artificially inflated or deflated prices.

75.     At all times and in all circumstances previously alleged herein, Defendants had the ability to cause and did cause artificial prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for NYMEX and COMEX precious metals futures contracts and options on those futures contracts, and were aware of the effects of spoofing and other manipulative conduct on those markets.

76.     By their intentional unlawful conduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

77.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to having transacted at artificial prices for NYMEX and COMEX precious metals futures contracts and options on those futures contracts, to which Plaintiff and the Class would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

78.    Plaintiff and members of the Class are each entitled to actual damages sustained in NYMEX and COMEX precious metals futures contracts and options on those futures contracts for the violations of the CEA alleged herein.

## SECOND COUNT
**For Employing a Manipulative and Deceptive Device
in Violation of the Commodity Exchange Act and Regulation 180.1(a)
(7 U.S.C. §§ 1, *et seq.*)**

79.    Plaintiff incorporates by reference the preceding allegations.

80.    Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9(1), and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC, which shall promulgate by not later than 1 year after July 21, 2010.

81.    In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a), which provides, in relevant part:

**§ 180.1 Prohibition on the employment, or attempted employment, of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for

future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4)     Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

82.     Defendants' unlawful conduct, as described herein, including systematically submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices in a pre-determined direction for NYMEX and COMEX precious metals futures contracts and options on those futures contracts, constitutes the employment of a manipulative and deceptive device.

83.     Defendants intentionally, or at least recklessly, violated Rule 180.1(a) by transacting in platinum, palladium, silver, and/or gold futures and options—transactions for which Defendants had no legitimate economic purpose and instead which were engaged in for the sole purpose of influencing the final trading prices of said futures and options contracts at the expense of Plaintiff and the Class.

84.     By their intentional unlawful conduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

85.     As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered damages and injury-in-fact due to having transacted at artificial prices for precious metals futures contracts and options on those futures contracts, to which Plaintiff and the Class

21

would not have been subject, but for the unlawful conduct of the Defendants as alleged herein.

86.      Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## THIRD COUNT
### For Principal-Agent Liability in Violation of the Commodity Exchange Act
### (7 U.S.C. §§ 1, *et seq.*)

87.      Plaintiff incorporates by reference the preceding allegations.

88.      Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

89.      Plaintiff and members of the Class are each entitled to damages for the violation alleged herein.

## FOURTH COUNT
### For Aiding and Abetting Violations of the Commodity Exchange Act
### (7 U.S.C. §§ 1, *et seq.*)

90.      Plaintiff incorporates by reference the preceding allegations.

91.      As an alternative to Counts First, Second, and Third, and solely if Defendants (or any one of them) are not found liable for a primary violation of the CEA, Defendants are liable for aiding and abetting market manipulation.

92.      Each and every Defendants had extensive knowledge of the manipulation and, with such knowledge, materially assisted the manipulation by the other Defendants.

93.      Each Defendant made and benefited from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.

94.      Each Defendant supervised the making of and benefits from the manipulative acts and willfully aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged

herein.

95.     Each Defendant, by and through their respective partners, agents, employees, and/or other persons, benefited from the manipulative acts and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the other Defendants.

96.     Each Defendant participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative acts. Each Defendant also benefited from the manipulative acts and willfully aided, abetted, counseled, induced, or procured the commission of violations of the CEA by the other Defendants

97.     Defendants each played their component role and each knowingly aided, abetted, counseled, induced, or procured the violations alleged herein. Defendants did so knowing of each other's manipulations and suppression of NYMEX and COMEX precious metals futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of NYMEX and COMEX precious metals futures and options contracts to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

98.     Plaintiff and members of the Class are each entitled to damages for Defendants' violations alleged herein.

## FIFTH COUNT
### Unjust Enrichment

99.     Plaintiff incorporates by reference the preceding allegations.

100.     Defendants financially-benefited from their unlawful acts. As alleged herein, Defendants submitted spoof orders electronically engaged in other unlawful manipulative techniques to manipulate the prices of NYMEX and COMEX precious metals futures contracts and options on those futures contracts, in an artificial and pre-determined direction. Defendants

intended to, and did, artificially alter prices in a pre-determined direction that benefited their trades and positions, at the expense of Plaintiff and the Class.

101.    These unlawful acts caused Plaintiff and other members of the Class to suffer injury, lose money, and transact at artificial prices for precious metals futures contracts and options on those futures contracts.

102.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution.

103.    Each Defendant should be required to pay restitution for its own unjust enrichment to Plaintiff and members of the Class.

## VIII. **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for relief and judgment and follows:

a)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

b)    For a judgment awarding Plaintiff and the Class damages, as well as punitive or exemplary damages, against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

c)    For a judgment awarding Plaintiff and the Class restitution of any and all amounts of Defendants' unjust enrichment;

d)    For an order imposing a constructive trust temporarily, preliminarily, permanently, or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

e)    For an order awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

f)    For such other and further relief as the Court may deem just and proper.

## IX.    **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

DATED: December 7, 2018                     */s/ Hollis Salzman*_____
                                            Hollis Salzman
                                            Kellie Lerner
                                            Bernard Persky
                                            Nahid A. Shaikh
                                            **ROBINS KAPLAN LLP**
                                            399 Park Avenue, Suite 3600
                                            New York, NY 10022
                                            Telephone: 212-980-7400
                                            Facsimile: 212-980-7499
                                            *HSalzman@RobinsKaplan.com*
                                            *KLerner@RobinsKaplan.com*
                                            *BPersky@RobinsKaplan.com*
                                            *NShaikh@RobinsKaplan.com*

                                            K. Craig Wildfang
                                            Thomas J. Undlin
                                            **ROBINS KAPLAN LLP**
                                            800 LaSalle Avenue, Suite 2800
                                            Minneapolis, MN 55402
                                            Telephone: 612-349-8500
                                            Facsimile: 612-339-4181
                                            *KCWildfang@RobinsKaplan.com*
                                            *TUndlin@RobinsKaplan.com*

                                            Aaron M. Sheanin
                                            **ROBINS KAPLAN LLP**
                                            2440 West El Camino Real, Suite 100
                                            Mountain View, CA 94040
                                            Telephone: 650-784-4040
                                            Facsimile: 650-784-4041
                                            *ASheanin@RobinsKaplan.com*

                                            Steven R. Goldberg
                                            **STEVEN R. GOLDBERG, ESQ.**
                                            225 Liberty Street, Suite 1020A
                                            New York, New York 10281
                                            Telephone: 212-845-5100
                                            Facsimile: 212-845-4197
                                            *Sgoldberglaw@verizon.net*

                                            *Counsel for Plaintiff Mark Serri*
                                            *and the Proposed Class*